Good morning, your honors. I'm John Olson. I'm here with my partner, Anne Hall, to represent the plaintiffs' appellants in this case. In this matter brought before you, the defendants' appellees supported a motion for summary judgment in the district court with affidavits of Ms. Landry, the individual defendant, and other witnesses. The appellants traversed those affidavits basically by raising questions of credibility. And those questions of credibility were asserted through the record in two different and distinct state court proceedings. The district court, having that in front of him, decided the issue of credibility and determined that no reasonable jury could find in favor of the plaintiffs. I mean, the records are in cases that the person you're suing here, Ms. Landry, was not a party to. She was not a party. The facts were identical. Kennedy, how is she precluded from – how does that give rise to issue preclusion? And you put in no evidence to contradict any of the allegations regarding the basis upon which she claims to have acted. Well, we're not arguing that there's an issue preclusion. And we've often – I don't – I don't mean I don't understand your argument. Our argument is that there were material issues of fact in relation to credibility. Well, how did you create the issue of fact? By saying that some judge in another case disbelieved her in a case in which she wasn't a party? By supplying the court with an extensive bench order in one case that analyzed all the same facts that appeared before him. By advising the court that, in fact, a presumptively reasonable jury in White Pine County in Nevada had found in favor of the plaintiffs and rejected the same information as supplied in the affidavits, and supplying the court with the post-trial order after the jury trial in White Pine County, which basically also commented on the credibility of the witnesses. Now, it's – Could I ask you to put that aside? If they had gone to a judge to get the equivalent of a warrant, on the basis of all of the facts that Ms. Landry said she relied upon, which let's assume I believe should be accepted as true, could she have gotten an order? Well, I believe under – first of all, under Nevada procedure, she would not have had to apply for and obtain a warrant. I know, but if she had to, that's a separate question. I'm dealing with good faith here, but could she have – the test that you're relying on is a test for avoiding a warrant, the imminent danger of whatever it is, death or serious injury. But that's the test to excuse getting a warrant or an order. But wouldn't she have been able – had she gone, had that been the appropriate procedure in Nevada, could she have gotten, under the circumstances in this case, couldn't she have gotten an order? No. Why not? At the stage that she would have applied for that order, it wouldn't have been Ms. Landry. That's the stage in which – the stage that she would have applied was the stage in which she actually acted without one. Right. The initial stage, when actually Tina Slaughter, one of the caseworkers, was acting on behalf of Ms. Landry and the DCSF in White Pine County. At that stage, there wasn't sufficient information involved to justify an order. Maybe I'm – I may not have all the facts. I'm talking about on the day they went in to this – To the school. To the school, on the basis of all of the information that they had, and they didn't – they did conduct an investigation and follow-up investigations. And I could tell you, if you accept the – her allegations on what she acted as true, I wouldn't have wanted my kid in that school. But could they have gotten an order if she had gone? Not prior to entry and the investigation, because the information they had – Which entry are we talking about? There was investigation, and they did enter onto the premises before the actual date on which they – There were two entries. Effectively closed down the school. There were two entries. The first entry involved a sort of a preliminary investigation in which various persons – For instance, the fire marshal pointed out the lack of a smoke alarm, and other people pointed out various deficiencies which were corrected. The school had no license at that time, and there was a cease and desist order that was not served. It was not served because they allowed the operators of the school to apply for a license and obtain a temporary license. You're not answering my question. On the day they went in, your claim is they should have gotten a warrant. And I'm asking you, and that there were no exigent circumstances to excuse getting a warrant. And the question that I'm asking you is, if they had gone for a warrant, couldn't they have gotten one? And my answer remains no, Your Honor. Because – Pardon? Because all of those allegations were insufficient? Because they were found ultimately to be insufficient. Yes. Based on some credibility finding that I don't agree with you necessarily rebound by. So I'm asking you, accepting that she's telling the truth about all of the facts that she relied upon, could a warrant have been issued in this case? I agree with Judge Dobrescu. And, Your Honor, I know I'm not making you happy with this. You're not answering my question. It's not a good way to persuade a judge to respond. I understand that. By avoiding a direct answer to a question. I'm giving you an answer, but it's not the answer you want. No. The answer you want is yes. I gave you a hypothetical which assumes that she's telling the truth about all of the underlying facts that she relied upon. Could she have gotten a warrant? And you are answering me by saying your hypothetical is not correct. But I would like you to assume the facts in my hypothetical. Let's assume the facts in your hypothetical. None of those facts demonstrated the existence of imminent danger to any child. And on that basis, she could not have gotten a warrant. That standard is the standard for acting without a warrant. Correct. My hypothetical asks you to assume that Landry is in front of a court of competent jurisdiction based on the information that she had. And you have to remove for your mind, in order to process this hypothetical, that there were later proceedings casting some doubt upon the veracity or validity or accuracy of this information. But that she goes to a judge of competent jurisdiction and says, I know I don't necessarily have to have a warrant, but I think under the circumstances, Your Honor, I need one. And here's my affidavit, and I'll swear that this is what I've been told based on the investigations conducted. What would a responsible magistrate have done? Assuming that all the facts were correct, then a responsible magistrate under the circumstance would say, okay, let's proceed and let's find out, let's have a hearing and find out whether this is true. Let's err on the side of safety and let's go ahead and pick up the children. Then we'd have a hearing. Then the facts would be exposed. But I'm Agent Landry, and I'm telling you, you're the judge. But, Your Honor, I have information that teachers at this school are sexually abusing underage children. Then I might hear you. And we can't have a hearing. If we have a hearing, this will be delayed and there will be more harm to these kids potentially. I need a warrant from you to remove the kids. Then what I might say is, oh, tell me the names of the children who are being abused and let's pick those children up. So at least to that extent there was enough. As to those specific children, and answering your question specifically, which is not what happened here. What happened here is all the children were picked up. I don't understand what happened here because it's not even clear to me exactly how they went in, where your client was when he was, to use the analogy which I don't accept, quote, arrested, which you can do without a warrant in certain places. I don't even know how old he was. I don't know that he was or he wasn't. At least I sort of glanced through the excerpts in the record yesterday and I couldn't find any of that out. I did find from Ms. Lamb's affidavit that when she returned on May 2, 2005 to remove the students from the facility, she says the removal was textbook. The children were given an opportunity to pack up their belongings and we tried to make them feel comfortable. The boys were taken to the Nevada Youth Training Center and the girls were taken to another one. The kids seemed glad to be removed from the ALA because they could say whatever they wanted. And in the Nevada Training Center they were held in separate cottages away from the other population until they could be returned to their parents, all of which was accomplished in three days. Let me tell you, the reason I asked you the question that I did, which you just barely answered, is that if they could have gotten a warrant, had she applied for one, how were you damaged at all by the fact that they didn't get one? We were damaged by the... Now listen to the question. If they could have gotten a warrant and they didn't get it, how were you damaged? Because if they had gotten a warrant, the same exact thing would have happened. So how were you damaged? How was this child who you were representing here damaged? Our burden would be different, but our damages would be the same. What are they? The damages are those... Assuming she could have gotten a warrant. Our burden would have been different because then we would have had to overcome the allegations that were the basis for the probable cause for the issuance of the warrant in a subsequent hearing. Then our damages wouldn't have been any different because the children still would have been taken in and into the youth center and the girls center. Your Honor, understand that most of these children, all these children were minors under the age of 18. None of them were adjudicated. By the way, what was the age range of this school? I would think about 14 to 17. None of them were adjudicated delinquents. The school did not accept drug addicts. The school did not accept children that had problems. Well, it may be often search warrants and arrest warrants are issued and it turns out that the person is innocent, but that's not really the issue. The issue is given the quantum of evidence that they need to undertake certain acts, was it unreasonable? And I don't see if they could have gotten a warrant and they didn't. I don't see how your clients were injured. I don't believe a warrant is necessarily a bar to further action. If the basis for obtaining the warrant is untrue information. Well, how were you hurt by the fact that they didn't get a warrant, if they could have gotten one? We're hurt by the pickup of the children because it disrupted them. They would have been picked up anyway. Yeah. So that hurt is there. They could have gotten a warrant. I'm misapprehending your point, Your Honor. I'm going to pass. Could you just tell me how old your client is or was at the time? There are 30 of them. We're representing all of them. All of them. You have about two minutes. You want to save it for rebuttal? I would like to. Okay. Are there any specific details as to each of these? Pardon? Are there any specific details as to how these were each or where each person was when they were so-called arrested? They were at the school, at the school facility. No, at the school. Were they playing on the field? Were they in a cafeteria? Were they in their own private room? Yeah. The social services, DCSF, came to the school, and they segregated the boys and the girls in different facilities, and they placed the staff in a different facility, and they conducted an investigation. When the children were picked up, they were picked up physically from the place that they were. You say picked up physically. From my reading of the affidavit, they came and they told the kids, look, you can't stay here. Dangerous. You know, take a shower, get dressed, don't worry. You're basically going to be returned to your parents. Some of these kids, according to this affidavit, were returned immediately. According to her affidavit, two or three children were immediately released to their parents. Who were on the premises, yes. After that, my manager called and said we couldn't let the kids go, and they'll be obtained a court order, which is somewhat. Okay. Thank you. We'll give you two minutes for rebuttal. Thank you for coming in today. We'll hear from Ms. Nichols at this time. May it please the Court. Andrea Nichols, Senior Deputy Attorney General from the Nevada Attorney General's Office. Can you put that mic a little closer to you and speak right into it? Thank you, Your Honor. That's great. I'm here today representing Robin Landry and her capacity as an employee of the State of Nevada. Let me follow up on the questions that Judge Corman asked your opponent. If we assume that Ms. Landry could have obtained a warrant or other court authority to do what was done, could that authority have been violated by the scope of what was accomplished? The authority to issue a warrant? Yeah. In other words, just take the search warrant example. You go to a magistrate, you obtain a search warrant, and it says we're going to search the apartment of Jane Jones. And the agents go in, and they not only search Jane Jones' apartment, they tear it to pieces. They search the two apartments on either side. They go into garages and storage units. In other words, the scope of the authorization of what the magistrate authorized them to do is vastly exceeded. No, Your Honor. If they had obtained a warrant to pick up the children, I don't believe that there is anything in the record that would show that the scope of that was in any way intruded upon. No requirement that before moving the individual students to detention facilities to contact their parents? Actually, Your Honor, in the record, I believe the affidavit of Jerilyn Tennyson shows the parents were contacted prior to the removal. Each and every one of them? I don't know that every parent was contacted. I don't know that that's in the record, but I do know that sometime between the first time that they went to this facility on April 23rd and the next time they went on – well, actually, there was a second time in between there – the last investigative time they went on May 1st, there were attempts to call every single parent to let them know that an investigation was taking place. When they went on May – And each and every one of those parents said, it's okay to keep my kid in a juvenile detention facility for two, three, four days? I don't know what each and every parent said, Your Honor. I think they did not inform the parents that they were removing the children. They informed the parents that they were investigating the facility. So was there a period of time between the time the children were removed and the parents were informed that – was there a gap in time there between the actual physical removal of the children and the notification of their parents? I think it's different with each child. For example, and it's in the record, the Mesher child, his parents were at the facility, and his parents took him. I think we understand that. The children were taken to facilities, and some of the parents were able to be there within hours of the children arriving at the facilities. I think some of the parents may even have been at the facilities by the time DCFS got there. What you need to understand is how remote of a location this is. This is 63 miles from Ely, Nevada. Ely doesn't have an airport. The nearest airports are Salt Lake City or Las Vegas, and they're a couple of hours by car. And none of the parents were close by. Just for a second. They come on the site of the school with whatever authority they have, the officials of the state, and they segregate the female students, correct? Yes, Your Honor. And from the male students and the staff. So at that point, they've basically frozen the situation, correct? Yes, Your Honor. Okay. So at that point in time, there is no danger of any kind to the children, is there? Or I'll ask it the other way. What danger was there to the children at that point in time? When DCFS staff were on site? Yes. That's a very good question. The staff of the Abundant Life Academy, I wasn't there, and I don't have this in the record, but they were not happy. They were not pleasant. But there was no real risk at that point to the kids once the officers of the state were there, right? Are you saying that they couldn't control the situation? The kids were in imminent danger that they couldn't control it? I don't know how long they could control the situation, Your Honor. Right. Is there any evidence in the record that the staff physically resisted what was being accomplished? No, Your Honor. Or that the children, the students, attempted to break free of their initial segregation or something like that? No, Your Honor. Okay. There were telephones on the premises? I believe so, yes. And children could have been allowed to call their parents? Well, Your Honor, I believe this is why the windshield in front is this big and the rearview mirror is this big, because hindsight is 20-20, and there's a lot of shoulda, coulda, woulda in this case. That's what we do. That's what we do, and that's what cases like this require. Is there any evidence as to what happened other than this affidavit from which I read, which includes a statement that the children were, the kids seemed to be glad to be removed and they were taken to vacant cottages and the efforts were made to contact? Is there anything in the record to indicate exactly whether they did make telephone calls or they didn't? Oh, yes, Your Honor. Actually, I believe if you look at the affidavit of Rob Lawler, that's in our supplemental excerpts of record at page 254 to page 259. It would take me a minute to find the exact page number, but I'm certain that it's towards the end of his affidavit. This is the supplemental ER? Yes, Your Honor. Okay. Interestingly, Mr. Lawler participated in each and every visit to the Abundant Life Academy. He was also one of the workers who went to the Sunnyside Ranch after the boys had been removed to the Sunnyside Ranch and one of the children. I was referring to Judge Faulconer's question. Does his affidavit refer to exactly what happened at the time that they went in? Yes, Your Honor. He does talk about removing the children from the facility. They took the girls to Caliente. Does he talk about, for example, whether or not the parents were called at that time? Is there any? Yes, Your Honor. I'm looking at page 259 of our supplemental excerpts of record, his affidavit at line 29. I helped supervise the girls at CYTC that night. We let them use cell phones to call their parents, got them something to eat, let them take showers and change into clean clothes. It was late, but we gave them an opportunity to unwind before telling them lights out. And also at line 31. In fact, I just noticed that from what I was reading on paragraph 28, Ms. Lamb's affidavit, she said, we let them use cell phones to call their parents. I helped supervise the girls at the facility that night. We let them use cell phones to call their parents, got them something to eat, let them take showers and change into clean clothes. It was late, but we gave them an opportunity to unwind before telling them lights out. Yes, Your Honor. I would point out this is not Ms. Landry's affidavit. This is Rob Lawler. Oh, is it Lawler? I'm sorry. Yes. And that's a point that I wanted to really emphasize with the court, is that Ms. Landry didn't unilaterally go out there and just remove the children. A team of licensed and experienced social workers and other state employees went out to Abundant Life Academy on May 1st. After discussing their findings with each other, they all agreed that the children were not safe. All right. Let's jump ahead. I want to get back to what Judge Hawkins questioned when he was talking about an analogy about the scope of the war. So you pick up the kids, and then you take them to juvenile detention. Now, there are sort of two different actions here. One action is the question of whether or not the state was justified in picking up the kids. The second thing is what happened afterwards. And some of them were allowed to call their parents, but it doesn't sound like you're calling your parents immediately saying, we've taken your kids out, you need to get here, let's work out something. And all of a sudden they're taken off to juvenile detention. Your Honor, the emphasis here was on keeping the children safe, and they did. And there was absolutely nothing in the record that would support any kind of allegation that the children were not safe for the very short time that they were in the custody of the Division of Child and Family Services. My question assumes that they were safe. The lawler affidavit indicates that there was a team present on the day of this separation and removal, correct? There were people there from the Department of Child Protective Services, Child Care Learning, State Fire Marshals, State Health Division, and some deputies from the White Pine County Sheriff's Office. Actually, Your Honor, I think that's a little bit confusing. On April 23rd, when they first went out to investigate this place, that's when they brought the people from the Health Division, the people from the Fire Marshals, and they identified some very troubling things. The septic system stank and didn't appear to be adequate, there were fire code violations, et cetera. The team that went out on May 1st, their affidavits are from about page 206 to about page 259 of our supplemental excerpts of record. We have Robin Landry, the defendant in this case. We have Deborah Norton, who says, I agreed that the children should be removed from ALA. We felt as a team that the children were in imminent danger at that time. We have Ted Tuso, we have Erica Olson, we have Denise Perry, and we have Rob Waller. They all submitted affidavits with, you know, their version of what happened on May 1st and May 2nd. But every single one of them agreed that the children should be removed. If we're going to get back to that question, I mean, I think you'd agree, you can't, you're not justified in picking up kids on the basis of a septic system malfunction. You're not, on perhaps fire code violations, you're not entitled to go in and grab kids, right? So, I mean, so far so good. Are we in agreement on that? Yes, Your Honor. Okay. So then what tips the balance for you? What do you think you should say to the point? Because so far, you know, you say they found serious problems septic. It was the lack of supervision, Your Honor. I wouldn't leave 35 children in my backyard unsupervised. But these children were unsupervised to the point that one child had started a fire in order to make a diversion to call 911. The children had access to knives. We had a child who reported that he was schizophrenic and was not getting his medication. Boys reported masturbation contests, that they were mounting each other. One child was very afraid that when he, this is the child that called 911, was afraid when he got taken into custody, he wouldn't be there to protect the other boys from staff and students. One child was unsupervised to the point that he was able to drink Windex. The children, there were allegations that they had sex with each other and with staff. One of the staff that they interviewed appeared to be intoxicated. I would argue, Your Honor, under the totality of those circumstances, these children were in imminent risk of serious bodily injury. And those facts are undisputed. They're the facts that are set out in the appellant's opening brief, in our brief, and in Judge Hicks's order that, I mean, if you're – if the children were in some kind of danger, even imminent danger, did those facts continue to exist when the children were segregated prior to their removal? I think that asks the question, Your Honor, of whether or not DCFS staff could have and should have stayed at the facility and called the parents from the facility rather than taking the children into DCFS custody. That may be a question that gets asked down the sort of chain of events. But my question is, were there any facts that suggested imminent danger or any danger once the children were segregated by sex and from staff? Not that I'm aware of, Your Honor. But at that point, they were in the custody of the Division of Child and Family Services. Right. I think you just have to say no. And I believe they kept them safe. There was no risk at that point. Don't you agree? I mean, you have to say no. Then the question is what happened next and what should have happened. And I realize we're in hindsight. But I've got to say, I mean, if you're a parent, you say, well, there were all these things going on. Thanks for getting the kids out. You put them where? You put them in juvenile detention? You put them in – you know, that's a whole different – we don't need – we aren't that far down the road. But I've got to say, there is an additional problem with the way that this was handled. Your Honor – The fact of lack of contact, you didn't call me for how many hours? You took my kid into juvenile detention when my kid is not a juvenile – hasn't committed a crime? And exposed – because we also, as you probably know, get a lot of suits about juvenile detention facilities, raising the same type of allegations raised against the school. But there are no – there's no allegations in this case that the children were mistreated at those facilities. And you have to understand, Your Honor, the state of Nevada didn't have – Listen, weren't they – did I read the record wrong? Weren't they placed – they weren't placed with the juveniles who were being detained. They were placed in cottages entirely separate. Yes, Your Honor. And these facilities, they don't have big fences around them. So this is a lawn with a building on it. And there's absolutely nothing in the record that would show that the children weren't safe. The problem is that the state of Nevada didn't have foster homes for 35 children. And during this whole investigation, they were scrambling with the question of, what are we going to do if we have to take 35 children into custody? My rearview mirror tells me you're about two minutes over your time. Thank you very much for coming and arguing today. Good argument. Thank you, Your Honor. Two minutes for rebuttal, counsel. I didn't have enough fun last time. Are there any affidavits from any parents that said they didn't get telephone calls? No. There are not. So we don't – and you didn't put in any. Pardon? You didn't put in any affidavits. Okay. Let me address this issue of the children being taken to juvenile detention facilities. NRS 432B specifically prohibits the incarceration in any detention facility or jail of any unadjudicated juvenile. These were all unadjudicated juveniles, and that's where they were put, which is, I think, as you're noticing, is distinct. They were not put in separate cottages away from the, quote, population? They were put in some cottages there, and I don't know to what extent they had access to the population. I do know – And you don't claim at this stage, there's nothing in the record that would claim that they were mistreated in the juvenile detention facility? With one exception. With one exception. Okay. There was mention of a boy who started a fire. That boy started a fire after all the boys were removed from the facility and taken to the Sunnyside Ranch out of fear that something bad was happening. He didn't know what was happening. That was before. That's right. And I'm going to tell you. Going back. But I'm going to explain that. The question was related to what was happening at these cottages on this juvenile detention facility where the children were taken. Right. And I answered that. I don't believe that there was any child that was mistreated there. This one boy, however, when the fire marshals and officers arrived, was arrested for making a false fire alarm. He was taken to an adult jail facility in Tonopah where he was incarcerated for a significant period of time until his father, who was serving in the U.S. military, could get back here from Germany and get him out. And nobody did anything about it. Nobody. Okay. All right. Thank you for your arguments. Both sides for their arguments. It's a very difficult case. It's submitted for decision. And the Court will stand adjourned. Roberts.
judges: Korman, Hawkins, Thomas